UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

Wayne Hollaus
   Plaintiff,

v

UNITED STATES OF AMERICA
   Defendant,

Case No. 2:25-CV-00267-JHC-DWC

Hon.

Verified Complaint for Damages
I. Introduction

1. This is a Federal Tort Claims Act (FTCA) action by Plaintiff Wayne Hollaus a federal prisoner alleging that Plaintiff suffered physical and emotional injury caused by the negligent or wrongful act or omission by employees at Federal Detention Center SeaTac (FDC) while said employees were acting within the scope of their office or employment and acting in their official capacities.
2. While Plaintiff was confined at the FDC, FDC employees had a duty of providing medical care to Plaintiff.
3. This duty of medical care of the FDC employees was breached and this caused Plaintiff to be injured as a direct result.
4. Various FDC employees "failed to exercise a degree of care, skill, and learning expected of a reasonably prudent health care provider at the time in the profession or class to which he or she belongs, in the State of Washington, acting in the same or similar circumstances; [and that] [s]uch failure was a proximate cause of the injury complained of." (RCW 7.70.040(1) and (2))
5. This breach of duty constitutes negligence and medical malpractice, and in one case, a failure to supervise.
6. Plaintiff seeks compensatory damages.
7. This action is intended to be filed contemporaneously with a Bivens claim by Plaintiff regarding the same conduct.

II. Jurisdiction

8. Jurisdiction of this Court is invoked under 28 U.S.C. § 1331 in that this is a "federal question" action arising under federal law, the FTCA, which extends to torts committed by federal employees within the "scope of [their] office or employment." 28 U.S.C. § 1346(b)(1)
9. All relevant conduct alleged in this complaint occured while Plaintiff was confined at the FDC which is located within the Western District of Washington.
10. The Plaintiff filed an administrative tort claim concerning the occurences complained of, within two years after those occurences, as required by 28 U.S.C. § 2401.

III. Parties

11. Plaintiff Wayne Hollaus at all times relevant was confined by the Bureau Of Prisons (BOP) at the FDC.
12. The FTCA allows suit against the federal government for torts committed by its employees. The only proper Defendant in an FTCA action is the United States.

1

## IV. Exhaustion of Available Remedies

13. Plaintiff exhausted his administrative remedies before filing this complaint.
14. Plaintiff submitted SF-95 forms in regards to lacking a proper full-face CPAP mask, issues with his joints and back including the lack of a provided support brace, and inadequate medication into the prison mail system on or around October 13, 2023, and received a notice from a receipt from the BOP's Western Regional Office dated November 2, 2023 and received a few days later.
15. Plaintiff never received a denial from the BOP's Western Regional Office for any of his submitted SF-95 forms. If the agency did deny any of the claims, Plaintiff never received a denial notice.
16. On or around July 7, 2024 Plaintiff sent a written letter to the BOP's Western Regional Office inquiring about his SF-95 forms and if there had been denials. The Western Regional Office never responded to Plaintiff.
17. Plaintiff then sent another written letter around August 14, 2024 to the BOP's Western Regional Office, again inquiring about his SF-95 submissions. The Western Regional Office did not respond to this letter either.
18. Courts have held that if the agency fails to act within 6 months, there is no time limit on brining suit. Pascale v. U.S.,998F.2d 186, 192-193 (3d Cir. 1993)(if the agency does not formally deny the claim, and has not finally disposed of the claim within the 6 months after it was filed,"the claimant may wait indefinitely before filing suit.");Taumby v. U.S.,919 F.2d 69, 70(8th Cir. 1998)(confirming this interpretation).

## V. Factual Statement

19. Plaintiff has sleep apnea, requires a CPAP machine, and had been using a CPAP machine prior to arriving at the FDC.
20. Sleep apnea is a serious health condition which if untreated can raise one's risk of high blood pressure, heart disease, and diabetes. (https://www.webmd.com/sleep-disorders/sleep-apnea/sleep-apnea).
21. Plaintiff suffers from allergies and sinus problems. Plaintiff requires a full-face mask when he is suffering from these problems because he cannot breathe through his nose, making his nose mask insufficient.
22. Plaintiff had previously taken a Canadian administered CPAP test, which showed that on average Plaintiff stops breathing 32 times per hour while sleeping.
23. Severe sleep apnea is defined as when apnea events happen more than 30 times per hour. (WebMD, Id.).
24. Before arriving at the FDC, Plaintiff had been suffering from joint issues, mostly in his right knee and right ankle, and back issues, mostly stemming from his condition of Plantar Fasciitis.
25. Also, before arriving at the FDC, Plaintiff was taking medication for blood pressure, ＿＿＿＿, and COPD/asthma, all prescribed by his Canadian doctor, Dr. Mark Gulka.
26. Plaintiff arrived to the FDC on March 2, 2023 with both a full face XL CPAP mask, a smaller nose mask, his CPAP machine, a scandisk insert in his CPAP machine which keeps track of his breathing, soft shoes, orthotic insoles, and his doctor prescribed medication, all of which he had brought with him from Canada.
27. During intake shortly after arrival, officers of the FDC's Receiving and Discharge Department(R&D) told Plaintiff that he could only have one CPAP mask, presumably citing their understanding of FDC policy.
28. Plaintiff protested the confiscation and insisted on brining both his masks in but was only allowed to bring the nose mask into the housing unit.
29. The R&D officers confiscated Plaintiff's full face mask and the scandisk insert of the CPAP machine.

30. The R&D officers also confiscated his soft shoes and orthotic insoles.
31. The R&D officers also confiscated his doctor-prescribed medication that he had arrived with.
32. Plaintiff's medical screening at intake consisted of a brief interview, a tuberculosis test, and an oximeter reading. There was no physical examination provided.
33. On March 13, 2023 Plaintiff submitted a hand written kite requesting a replacement for his full-face XL CPAP mask, orthotics, his medication, including his blood pressure pills, and for a physician's appointment.
34. This kite was responded to by officer Satalino on a response dated April 7, 2023 only stating that Plaintiff had "an upcoming appt[sic] with a provider."
35. For about 3 weeks after arriving at the FDC Plaintiff had no medication at all.
36. Sometime around March 23, 2023 Plaintiff was prescribed Amlodapini 5mg to be taken once every morning for blood pressure and given an Asmanex Twisthaler(mometasone furoate) for is asthma.
37. Even after taking 5mg of Amlodapine daily, Plaintiff felt that his blood pressure was still consistently high, and much worse than it was before he had arrived at the FDC when he was on his previous blood pressure medication.
38. On March 28, 2023 Plaintiff sent an electronic kite to Health Services regarding his confiscated full-face CPAP mask stating that "I need this for when I have sinus issues and cannot use my nose mask which is a regular occurance with my lung issues and my asthma." (All kites spelled in context)
39. On the same kite, Plaintiff requested "a pair of medically prescribed orthotics and proper physician approved footwear," citing his Plantar Fasciitis. He stated that "I am in constant paindue to wearing insufficient footware supplied by the institution (crocs). I am experiencing pain and swelling in my right foot and pain in my right knee at this time, which in time, will start affecting my hips and then my back," adding that his family doctor and chiropractor had prescribed orthotics and medical shoes "for many years now."
40. In the same kite, Plaintiff stated that "If you need papers signed to access my medical records to fulfill my requests, I am more than willing to sign forms."
41. On April 3, 2023 Plaintiff sent a kite to Health Services, addressed to "Polowski," of which he meant Acting Health Services Administrator (AHSA), Kevin Posalski stating that "I have seen other inmates CPAP provided by the state that includes many different sizes and types of masks, so I would appreciate if you could supply me a full mask."
42. On the same kite, Plaintiff again grieved his confiscated orthotics and soft shoes, stating;"[s]ince my arrival, my right foot has swollen up as well as my right knee."
43. Also on the same kite, Plaintiff mentioned that he did start receiving some medication 3 weeks after arrival, but has not had a physical exam, and requested to be seen by a physician.
44. On April 12, 2023 Plaintiff again sent a kite to Health Services requesting a proper physician's examination and re-evaluation of his blood pressure prescriptions.
45. On April 14, 2023 Plaintiff sent a kite to Health Services requesting a "[d]octors visit to do a physical exam that should have been done before giving medications or being left in the facility with mo medical attention given."
46. On April 17, 2023 Plaintiff sent a kite to Health Services stating "I was having higher than usual blood pressure and after asking to check my BP, I was told by pill line to just lay down and drink water."
47. On April 19, 2023 Plaintiff sent a kite to Health Services requesting orthotics, stating this is an "immediate need" and that he is in "excruciating pain" from not having them, and a physicians examination at sick-call to go over his conditions, including sleep apnea, and so that Plaintiff "would be able" to sign a waiver for his "medical records."
48. Plaintiff continually pressed the FDC staff for a solution for these issues, and for a physician's examination, in numerous other kites, only a fraction of which are detailed here.

3

49. Sometime in late April or early May, AHSA Kevin Posalski signed offon a soft shoe pass for Plaintiff.
50. On May 8, 2023 Plaintiff received orthotic insoles.
51. On May 17, 2023 Plaintiff sent a kite to Health Services requesting an "ankle compression sleeve" for his right ankle as he was having difficulty building muscle in his ankle, compounded by not having proper footwear, and that this stress was affecting his right knee also.
52. On May 26, 2023 Plaintiff sent a kite to AHSA Kevin Posalski of Health Services regarding his soft shoes which according to the tracking number had arrived on May 12, 2023.
53. On May 29, 2023 Plaintiff sent a kite to Health Services, addressed to "Poslowski," of which he meant AHSA Kevin Posalski, stating that "I have breathing problems and hyper tension and acid reflux to which you have never provided a physical exam for. As well, you have not fully replaced my Dr. prescribed medications from my regular Canadian prescriptions nor replaced my cpap mask you have taken and I am having problems breathing when my allergies are affecting me right now."
54. On May 30, 2023 Plaintiff sent another kite to AHSA Kevin Posalski of Health Services regarding his soft shoes, stating that his shoes "must be collecting dust in Health Services somewhere, which I am told that you are head of."
55. On June 7, 2023 Plaintiff sent a kite to Health Services, again requesting to see a physician and receive an examination, evaluation of his medication, his issues receiving soft shoes, ankle and knee support braces, and stating his fear that the "damage" to his joints may be "causing lifetime debilitating injuries if not cared for and corrected."
56. On June 9, 2023 Plaintiff had a medical appointment with Dr. Maria Dy, the physician at the FDC. This was Plaintiff's first and only physical medical examination.
57. At this appointment, Dr. Dy did a rudimentary check of Plaintiff's knees by having him move them (extend his legs while seated).
58. At this appointment Dr. Dy told Plaintiff that she will order x-rays for his knees.
59. At this appointment, Plaintiff signed waivers for the Health Services access to his previous Canadian medical records.
60. At this appointment, Plaintiff mentioned his high blood pressure with Dr. Dy, whom performed a blood pressure check on Plaintiff which read 150/90 she prescribed double the dose of Amlodapine, 10 mg per day, and also newly prescribed Lisinopril at 20mg per day for his blood pressure.
61. At this appointment, Dr. Dy informed Plaintiff that he had high cholesterol and she prescribed Plaintiff Xatorvastatin 20mg.
62. At this appointment, Plaintiff also spoke with correctional officer and Health Services worker Ashley Martin, who was also present, regarding the fact that she was in charge of stocking medical equipment at the FDC, and about his medical shoes, and their whereabouts.
63. Shortly after this appointment, Plaintiff begain experiencing effects from the newly prescribed medication.
64. On June 16, 2023 Plaintiff sent a kite to Health Services stating that he was feeling light-headedness and requested info about the medications he had been prescribed because he didn't "know any of the side effects from any of these medications as there were no instructions given with my new meds."
65. On June 17, 2023 Plaintiff learned that his soft shoes had been rejected because there was not an authorization form on the inside and outside of the package. Counselor Smith did not inform Plaintiff of this requirement when he informed Plaintiff on how to send the shoes.

66. Plaintiff never received a response to the June 16, 2023 kite, but stopped taking Xatorvastatin, which he assumed was causing the adverse effects, on June 22, 2023 at his own discretion.
67. Plaintiff notified Health Services in several kites at this time, beginning on June 22, 2023 that the medication was causing him problems and that he needed a replacement medication.
68. On June 22, 2023 AHSA Kevin Posalski responded to an informal resolution grievance submitted by Plaintiff earlier that month requesting a replacement full-face CPAP mask.
69. AHSA Kevin Posalski's response to Plaintiff stated that "[w]e are currently out of the larger size face masks, and they are on order. You will be provided with a replacement as soon as they arrive."
70. AHSA Kevin Posalski did not mention anything about a one-mask policy or the need for Plaintiff to turn in his nose mask in order to receive his full-face CPAP mask.
71. Also, on June 22, 2023 AHSA Kevin Posalski responded to an informal resolution grievance submitted by Plaintiff earlier that month regarding Plaintiff's request for support braces for his ankle and knee.
72. AHSA Kevin Posalski's response to Plaintiff stated that "[a] consult was written for an x-ray of your ankle and knee in order to determine the extent of your injuries. A request for medical records has also been sent to the provider indicated with no results as of this writing. Until one of those are received and reviewed, you cannot be provided a brace."
73. Plaintiff had no control over if or how soon Health Services would schedule him for an x-ray.
74. On June 26, 2023 Counselor J. Smith provided a new shoe pass to Plaintiff and to several other inmates who also had trouble receiving shoes with an approved shoe pass.
75. On June 26, 2023 Plaintiff sent a kite to Health Services regarding the adverse effects of his new medications, stating that he had submitted hand-written kites a few days earlier with no response, and detailed that he had to ask the pill line nurse on how (when, with and without what foods and drinks, etc.) to take the new medication, and he again requested a sick-call visit and a blood pressure check.
76. On June 28, 2023 Plaintiff sent a kite to Health Services again regarding his new medication prescribed by Dr. Dy, stating that he was experiencing "severe chills, feeling lethargic, numbness in hands/fingers, aching muscles, light-headedness, and blurry vision." He sent a follow up kite 2 days later pertaining to the same issue.
77. On July 1, 2023 Plaintiff noticed that nurse Egelston happened to have a blood pressure monitor on her cart and asked to have his blood pressure checked. Plaintiff's blood pressure was read to be 155/103.
78. On July 3, 2023 Plaintiff attempted to file an administrative remedy for the CPAP mask issue. He turned it in to the Unit Manager Lavatia, but she denied it and it was never processed for the reason that medical was aware of this issue and was waiting for the mask to be re-stocked. He sent a follow up kite to Unit Manager Lavatia several days later requesting help with the issue.
79. On July 7, 2023 Plaintiff sent a kite to Unit Manager Lavatia in which he complained of the lack of responses to his kites and grievances, stating; "your medical system with kytes and email is noneffective and falling directly into the waste basket. I realize that you're understaffed but these are life threatening."
80. On July 29, 2023 Plaintiff was seen by Officer Newland, a Health Services officer who had come in from out of state to temporarily work at the FDC, whecked Plaintiff's blood pressure which read 148/88, and provided him with a new prescription cholesterol medication; Rosuvastatin Calcium 5mg, to be taken once every morning.

81. On July 20, 2023 Plaintiff gave officer Newland the remainder of his Xatorvastatin prescription. Within the next few days, Plaintiff received Rosuvastatin.
82. On July 21, 2023 Plaintiff sent a kite to Unit Manager Lavatia after hearing that his soft shoes were at the post office where they arrived on July 11, 2023.
83. On the same day, Unit Manager Lavatia responded stating "[y]our shoes are in the mailroom. I advised medical today and they will be picking them up on Monday.
84. Plaintiff received his soft shoes on July 26, 2023.
85. On July 27, 2023 Plaintiff received a response to an administrative remedy from FDC Warden Howard Barron regarding his requests for ankle and knee support braces.
86. In Warden Howard Barron's response, he repeated Defendant Posalski's previous response stating that "[u]ntil we receive verification that an ankle and knee brace are needed (from previous medical records or an x-ray), we cannot provide you with a brace."
87. On August 3, 2023 Plaintiff sent a kite to Warden Howard Barron regarding his attempt to obtain a full-face CPAP mask, stating that he has been requesting since his arrival and that "I am losing sleep and my health is deteriorating because of it. I am hardly able to fall asleep at all...Please, if you're willing, help stock masks through the right staff members."
88. On August 7, 2023 Warden Howard Barron responded to the above kite stating that "Communication has been made with the Health Services Administrator and the Assistant Health Services Administrator in order to address your concern accordingly."
89. Some time in early August, 2023 Plaintiff ran out of blood pressure medication and began requesting refills at pill line.
90. On August 10, 2023 Plaintiff suffered an injury while walking the tier in the day room, which he felt to be a pinched nerve or muscle sprain, and which he felt to be from his left hip to mid-back.
91. This injury left Plaintiff bed-ridden for a week, with difficulty breathing even when lying down, and Plaintiff needed to borrow a walker from another inmate in order to move around, and with limited mobility in the following months.
92. To the best of Plaintiff's information and belief, his injury was catalyzed by the stress on his joints and back and that he had been experiencing and requesting medical care for, and may have to do with his sciatic nerve.
93. On the same day, August 10, 2023 Plaintiff filed a hand written sick-call request regarding his injury that he specifically marked as "urgent" and as an "emergency."
94. On August 11, 2023 Plaintiff sent an electronic kite to Dr. Dy of Health Services regarding his injury the previous day regarding his injury from "the cumulative stress that has been on my back, hips, knees, and joints...it is extremely painful and I can hardly move. I am bed-ridden, in pain, and I may need a wheelchair and medication to help the pain." Plaintiff requested to be "urgently" seen by defendant Dy, and cited increased trouble breathing.
95. Plaintiff followed up the above kite with more handwritten and electronic requests for sick call.
96. On August 15, 2023 Plaintiff spoke to Counselor Smith, whom had spoken to Ashley Martin, who informed Counselor Smith that she had not ordered the full-face CPAP mask yet because she had to get a purchase order approved by one of her superiors.
97. On August 16, 2023 Plaintiff sent a kite to Ashley Martin stating he had heard from other officers that she is responsible for restocking medical equipment, and stating "[p]lease do what you can to see that there is a solution to my issue soon...This is an urgent issue."

6

98. On August 23, 2023 Health Services responded to a kite sent nearly 3 months earlier, on June 30, 2023 stating "[w]e will schedule you for a sick call."
99. Later, on September 12, 2023 Health Services again responded to a 3 month old kite, one that was sent on June 7, 2023 stating "[A] sick call appointment has been scheduled."
100. Despite these requests, Plaintiff was never seen for sick-call for his injury in the nrealy 3 months he remained at the FDC.
101. On September 3, 2023 Plaintiff sent a kite to Dr. Dy regarding her refusal to see him for sick-call and his recent injury, stating that he is still "under a lot of pain" and stating; "I still have not had any type of response at all... why have I not had a sick-call scheduled for a severe debilitating injury such as this in four weeks? This is a direct result from your refusing my shoe and orthotic issues as well as my knee and ankle brace requests. Taking five months to get a shoe pass and receive the shoes have in turn caused more advanced problems and worsening conditions throughout my legs and now my back." Plaintiff also mentioned that has still not received ankle or knee support braces or an x-ray, and he requested another sick-call.
102. On September 5, 2023 Plaintiff sent a kite to Health Services stating that he had been out of meds since early August and that he had been "overlooked". A copy of this kite was also handed to nurse Egelston at pill line. Plaintiff's medication was refilled on September 8, 2023.
103. On September 5, 2023 more than 6 months after Plaintiff arrived at the FDC, Plaintiff received a pass for shipping in a CPAP mask at his own expense. This pass had been approved on 08/29/2023.
104. A third party sent in a mask which was received by Plaintiff on September 22, 2023. However, the third party sent the wrong mask on accident; another nose mask.
105. Plaintiff transferred from FDC SeaTac in early November, 2023.
106. Plaintiff was never provided an ankle or knee support brace while at the FDC despite first mentioning a need for ankle and knee support nearly 6 months before transferring, and despite experiencing daily severe pain in both of his ankles, knees, hips, and his back.
107. Plaintiff was never provided x-rays to evaluate his knee and its need for a brace, despite x-rays having been unambiguously ordered nearly 5 months before Plaintiff was transferred.
108. Plaintiff was never provided a follow up appointment or sick-call appointment ,generally, in the near 5 months he remained at the FDC following his June9, 2023 appointment with Dr. Dy, besides a brief callout to a nurse that concerned his cholesterol medication and blood pressure, despite continually requesting appointments during that time, and despite an injury suffered on August 10, 2023 that left him bed-ridden and requiring the use of an inmate-borrowed walker for a period of more than a week, and with longer-term limited mobility.
109. Building from initial stress on his right ankle and right knee, over time, both of Plaintiff's knees and ankles became affected with increasingly severe pain and stress, as well as both sides of his hips, and eventually his back began to become increasingly strained and painful, thus suffering further avoidable injury.
110. Also due to the cumulative lack of care provided in regards to Plaintiff's joints and back, Plaintiff was unable to exercise properly, often feeling unable to exercise beyond basic stretching, and had gained weight which caused more stress on his joints, further limited his mobility, and generaly interfered with daily activities.
111. Due to not having a proper CPAP mask for his duration at the FDC, Plaintiff lost a significant amount of restful sleep.
112. To the best of Plaintiff's information and belief, his health deteriorated from not having a proper functioning CPAP mask while being detained at the FDC, with many nights not yielding any restful sleep at all.

113. Over the entire duration of Plaintiff's incarceration at the FDC, Plaintiff had his blood pressure checked a total of 3 times, each detailed above, despite continual requests to have his blood pressure properly monitored.

114. Ultimately, in the first 3 months of his incarceration at the FDC he was provided either no or inadequate blood pressure medication.

115. Plaintiff was never provided a cholesterol reading in the near 5 months that Plaintiff remained at the FDC following the June 9, 2023 appointment with Dr. Dy, at which he was prescribed medication that caused adverse side effects, and he was not provided with a different cholesterol medication until more than one month after he had discontinued use of the previous medication and had informed staff of the adverse side effects.

116. Plaintiff heard staff members complain numerous times throughout his period of confinement at the FDC that they were understaffed.

117. Understaffing at the FDC garnered major media attention in a January 2, 2023 Seattle Times article, published only 2 months after Plaintiff was transferred from the FDC, reporting: "[m]edical unit vacancies have resulted in delayed treatment, said regional Federal Public Defender Colin Fieman." (SeaTac federal jail struggles with 50% vacancy rate for key positions, Nina Shapiro, The Seattle Times).

118. Plaintiff observed many other inmates at the FDC also suffer from inadequate sick-call procedures, including but not limited to Thomas Carver, Ronnie Griffin, and Michael Slocumb.

119. Plaintiff suffered daily mental anguish due to his medical needs being ignored and the daily physical pain they caused him.

**The effects of Plaintiff being deprived a proper functioning CPAP mask, delayed in the provision of proper footwear, deprived of ankle and knee support braces, and deprived or given inadequate blood pressure medication on obesity and obesity hypoventilation syndrome (OHS)**

120. The Defendant's conduct proximately caused Plaintiff to have a higher obesity plateau and OHS.

121. Obesity is a major risk factor for sleep apnea, and the two conditions have a complex bidirectional relationship.

122. OHS, or Pickwickian syndrome, results from elevated Carbon Dioxide levels in the blood and not enough Oxygen.

123. Deprivation of Oxygen from untreated sleep apnea can lead to higher obesity plateaus and OHS.

124. Plaintiff complained in multiple kites to Health Services that he was gaining weight, and that he was unable to exercise properly due to not having proper footwear, and support braces for his ankle and knee, as well as the danger to exercise due to the lack of treatment for his high blood pressure and breathing difficulties.

125. Plaintiff was told by Dr. Dy at his only physical examination on June 9, 2023 that he should be no more than 200lbs (despite knowing, and being reminded then, of the barriers for Plaintiff to do so properly), at which time Plaintiff weighed approximately 265lbs, gaining approximately 15lbs since his arrival 3 months earlier. Plaintiff later weighed 268lbs on July 19, 2023.

126. Moderate obesity can reduce life expectancy by about 3 years, and severe obesity can reduce life expectancy by about 10 years.

127. OHS typically leads to a shortened life expectancy, especially is left untreated, with the mortality rate for OHS at 23% over 18 months for people with other medical conditions.

128. The deprivation of Oxygen Plaintiff experienced from not having a proper functioning CPAP mask while confined at the FDC, and the deprivation or significant delay in the provision of needed medical equipment which interfered with Plaintiff's ability to exercise, and the deprivation or inadequacy of provided blood pressure medication proximately caused a higher obesity plateau in Plaintiff,

and has proximately caused OHS, and has thus proximately reduced Plaintiff's life span.

**The effects of Plaintiff being deprived of a proper functioning CPAP mask, and of being deprived or given inadequate blood pressure medication on heart related conditions**

129. Plaintiff not being provided with a properly functioning mask, leaving his sleep apnea untreated, proximately caused heart failure, hypertrophic cardiomyopathy (HCM), coronary artery disease (CAD), the symptoms of which Plaintiff was exhibiting during his confinement at the FDC.

130. Sleep apnea causes nocturnal hypoxemia (dropping in blood oxygen levels during sleep), which can worsen hemodynamics and symptoms in HCM, a condition in which the heart muscle wall becomes abnormally thick, making it difficult for the heart to pump blood.

131. The stress on the heart caused by untreated sleep apnea can also lead to heart failure which occurs when the heart muscle is not able to pump blood as well as it should.

132. Sleep apnea is also linked to CAD, which is damage or disease of the heart's major blood vessels. Repeated surges in blood pressure levels, a symptom of untreated sleep apnea, can damage the lining of the blood vessels causing CAD.

133. Even well monitored sleep apnea increases the risk of heart failure by 140% and the risk of CAD by 30%; with untreated and poorly treated sleep apnea these rates of risk are higher.

134. Heart failure is associated with a loss of 7.3 years in life expectancy compared to the general population, and the survival rate of chronic heart failure is only 30% after 10 years.

135. HCM is a highly complex disease capable of serious clinical consequences and premature death in some cases.

136. The American Medical Association estimates that individuals with CAD may experience a reduced life span by around 10 years.

137. The American Heart Association estimates that individuals who suffer a heart attack have a reduced life span by around 16 years. Most heart attacks are caused by CAD.

138. Plaintiff began suffering from swollen legs and ankles, chest pain, difficulty breathing, light headedness, and fatigue which are all manifested signs of heart failure, HCM, and CAD, while being deprived a functional CPAP mask.

139. The deprivation of Oxygen Plaintiff experienced from not having a proper functioning CPAP mask while confined at the FDC has proximately caused heart failure, HCM, and CAD, and has thus proximately reduced Plaintiff's life span.

## VI. Claims of Relief

140. The duty of BOP employee Kevin Posalski, as AHSA, to provide Plaintiff with adequate medical care was breached by his failure to provide Plaintiff with a full-face mask for his CPAP machine in the 8 months that Plaintiff was at the FDC, and of delaying 6 months to provide a pass to have a mask sent in, despite being aware through that time that Plaintiff's nose mask was inadequate, and which caused physical, and emotional pain and injury. This breach of duty constituted negligence and medical malpractice.

141. The duty of Kevin Posalski, as AHSA, to provide Plaintiff adequate medical care was breached by his failure to provide Plaintiff with an ankle and/or knee support brace, provide an x-ray for this issue in the near 5 months PLaintiff remained at the FDC after Health Services ordered an x-ray as a pre-requisite for receiving a brace, in there being significant delay in providing orthotics and a soft shoe pass, and to generally provide timely care which could have prevented the further deterioration of health and injury to PLaintiff in his joints and back, despite his awareness of PLaintiff's requests and condition, and which caused physical, and emotional pain and injury. This breach of duty constituted negligence and medical malpractice.

142. The duty of Kevin Posalski, as AHSA, to provide Plaintiff adequate medical care was breached by his failure to ensure that Plaintiff was provided with adequate medication, without delay or extended lapses of unavailability, and that Plaintiff's medication needs and requests were responded to promptly, which caused physical and emotional pain and injury. This breach of duty constituted negligence and medical malpractice.

143. The duty of Kevin Posalski, as AHSA, to provide Plaintiff adequate medical care was breached by his failure to ensure that the FDC had adequate sick-call procedures, and adequate medical screening at intake(R&D), and thus to ensure Plaintiff and other inmates access to adequate medical care, and that emergency sick-call requests are responded to promptly, or in allowing a 3 month delay for Plaintiff to even sign a waiver for access to his medical records despite his immediate requests to do so was part in causing significant delay in medical care which caused physical, and emotional pain and injury. This breach of duty constituted negligence and medical malpractice.

144. The duty of BOP employee Maria Dy to provide Plaintiff with adequate medical care was breached by her failure to prioritize or make urgent the provision of a full-face mask to Plaintiff for his CPAP machine in the 8 months Plaintiff was at the FDC, while she was the only full-time physician, and was aware throughout that time that Plaintiff's nose mask was inadequate, which caused him physical and emotional pain and injury. This breach of duty constituted negligence and medical malpractice.

145. The duty of Maria Dy to provide Plaintiff adequate medical care was breached by her failure to prioritize or make urgent the provision to Plaintiff of ankle and/or knee support braces for Plaintiff since Plaintiff had placed Health Services on notice for this issue nearly 6 months before transferring from the FDC, and to schedule and see to an x-ray which Maria Dy ordered for Plaintiff nearly 5 months before Plaintiff was transferred from the FDC, all of which resulted in further deterioration of health, and in physical and emotional pain and injury to Plaintiff, despite her awareness to Plaintiff's condition and requests. This breach of duty constituted negligence and medical malpractice.

146. The duty of Maria Dy to provide Plaintiff adequate medical care was breached by her failure to see Plaintiff for sick-call or allow him to sign a waiver for access to his medical records for the first 3 months following his arrival until their June 9, 2023 appointment, despite numerous requests to Health Services made in that time by Plaintiff requesting to see a doctor regarding his conditions, including his issues with prescribed medications which were prescribed to him without a physical examination being performed, or even once in the remaining near 5 months that Plaintiff was at the FDC, despite his numerous requests for a follow-up appointment regarding his conditions, including emergency requests for sick-call, to Health Services and to Maria Dy directly, following a debilitating physical injury, and his requests to sign a waiver for his medical records shortly following his arrival to the FDC, causally contributed to the deteriorating of his health, and to physical and emotional pain and injury. This breach of duty constituted negligence and medical malpractice.

147. The duty of BOP employee Ashley Martin to ensure Plaintiff was provided with proper medical equipment by ordering and stocking necessary equipment was breached by her failure to stock and provide Plaintiff with a working full-face mask for his CPAP machine for the 8 months that Plaintiff was at the FDC, or take action to promptly rectify Plaintiff's issue and prevent unreasonable risk to Plaintiff's health, despite being aware throughout that time that Plaintiff's nose mask was inadequate, causally contributed to the deterioration of Plaintiff's health, physical and emotional stress, and mental anguish. This breach of duty constituted negligence and medical malpractice.

148. The duty of BOP employee, and FDC Warden Howard Barron to fulfill his supervisory role as Warden, and to ensure that the FDC operated properly, including Health Services, was breached by his failure to prevent the above stated breaches of his subordinates over a significant period of time, despite his awareness and responsibility at Warden, and that such violations were part of an informal custom at the FDC of inadequate medical care, and of institutional procedures and implemented policies which included chronic understaffing and inadequate sick-call procedures, which caused physical and emotional pain and injury to Plaintiff. This breach of duty constituted negligence, and a failure to supervise.

149. The above failures of FDC SeaTac employees to provide Plaintiff with a proper functioning CPAP mask, of unduly delaying in providing adequate medical footwear and an ankle or knee support brace, which interfered with Plaintiff's ability to exercise, and to consistently provide adequate medication proximately caused a higher obesity plateau in Plaintiff, and has proximately caused OHS, and has thus proximately reduced Plaintiff's life span.

150. The above failures of FDC SeaTac employees to provide PLaintiff with a proper functioning CPAP mask and to consistently provide adequate medication proximately caused heart failure, HCM, and CAD and thus proximately reduced Plaintiff's life span.

## VII. Relief Requested

WHEREFORE, Plaintiff requests that this Court grant the following relief:

A. Declare that Plaintiff was subject to negligence and medical malpractice, and supervisory failure, resulting in physical and emotional injury, by employees of the BOP while Plaintiff was confined at the FDC while acting in their official capacities.

B. Award compensatory damages for PLaintiff's physical and emotional injuries.

C. Create a constructive trust to manage existing and future health complications that Plaintiff may have as a proximate result of the conduct of BOP employees at FDC SeaTac.

D. Grant Plaintiff such other relief as it may appear Plaintiff is entitled to.

Signed this    12th    Day of December, 2024.

## DECLARATION

Pursuant to **28 U.S.C. §1746**, I declare under perjury that the preceding is true and correct. Signed this 12th day of December, 2024.

_____